UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:19-cr-00037-JAW |
| | ) | |
| STEVENSON ARIEL ALMONTE | ) | |
| FELIZ | ) | |

**ORDER ON MOTION TO SUPPRESS**

The Court denies a defendant's motion to suppress the evidentiary results of a warrantless vehicle search and seizure and a warrantless arrest because it concludes that law enforcement had probable cause based on the totality of the circumstances to search the vehicle, to seize drugs within the vehicle, and to arrest the driver and passenger. The Court also credits the statements of the confidential informant largely because his detailed predictions of the future turned out to be true.

I.   **BACKGROUND**

On December 7, 2018, town of Gorham, Maine, police together with Federal Bureau of Investigation (FBI) Task Force Officers and Special Agents detained Stevenson Ariel Almonte Feliz together with Jose Manuel Carvajal Gonzalez in the parking lot of a Burger King in Gorham, Maine. *Criminal Compl.*, Attach. 1, *Aff. in Supp. of Criminal Compl.* ¶¶ 1, 6-7, 11 (ECF No. 1). On December 10, 2018, the United States of America (Government) issued a criminal complaint against Mr. Almonte Feliz and Mr. Carvajal Gonzalez, charging each with knowing and intentional possession with the intent to distribute of forty grams or more of fentanyl,

a violation of 21 U.S.C. § 841(a)(1). *Criminal Compl.* On March 1, 2019, a federal grand jury indicted each defendant on the same charge. *Indictment* (ECF No. 42).

On November 12, 2019, Mr. Almonte Feliz filed a motion to suppress evidence. *Def.'s Mot. to Suppress Tangible Evid.* (ECF No. 93) (*Def.'s Mot.*). On December 23, 2019, the Government filed its response. *Gov't's Resp. in Opp'n to Def.'s Mot. to Suppress* (ECF No. 100) (*Gov't's Opp'n.*). On February 28, 2020, the Court held a suppression hearing. *Min. Entry* (ECF No. 113). On April 29, 2020, Mr. Almonte Feliz filed a supplemental memorandum. *Def.'s Suppl. Mem. in Supp. of Mot. to Suppress* (ECF No. 118) (*Def.'s Suppl. Mem.*). On May 18, 2020, the Government filed its supplemental response. *Gov't's Post-Hr'g Mem. in Opp'n to Def.'s Mots. to Suppress* (ECF No. 122). (*Gov't's Suppl. Mem.*).

## II.    THE SUPPRESSION HEARING

The Government called two witnesses at the suppression hearing of February 28, 2020: Task Force Officer Matthew Cyr and Supervisory Special Agent Patrick Clancy. *Witness List* (ECF No. 112). The Government also introduced eleven exhibits. *Ex. List* (ECF No. 111). Mr. Almonte Feliz called no witnesses and introduced no exhibits. A transcript of the hearing has been prepared and docketed. *Tr. of Proceedings* (ECF No. 114) (*Tr.*).

### A.    Task Force Officer Matthew Cyr

#### 1.    Background and Training

Officer Cyr testified that he is a South Portland police detective who has been assigned to the FBI and he has served as a task force officer for about a year and a

half. *Tr.* at 5:25-6:22. After describing his education, training and experience, Officer Cyr turned to the investigation in this case. *Id.* at 5:25-7:09. Officer Cyr stated that in October 2018, he became part of a joint investigation of a local drug trafficker in Gorham, Maine. *Id.* at 7:10-18.

### 2.    Confidential Informant 2

The task force developed a confidential informant (CI-1) who was able to purchase fentanyl from the target, which led to the arrest of the target. *Id.* at 7:19-8:08. After arrest, the target cooperated with law enforcement and identified the source of the fentanyl the target had been distributing. *Id.* at 8:09-18. The cooperator (CI-2) told law enforcement that his drug source was a man from the Dominican Republic who was living in the Lawrence, Massachusetts, area and whom he knew as Leo. *Id.* at 8:15-21. CI-2 agreed to purchase fentanyl from Leo. *Id.* at 8:22-25.

### 3.    December 7, 2018: An Attempted Controlled Purchase

On December 7, 2018, the task force was attempting to set up a controlled purchase of fentanyl through CI-2. *Id.* at 9:01-05. As of December 7, 2018, CI-2 was in the Cumberland County Jail in Portland, Maine, and therefore to arrange for the purchase, Officer Cyr and a Portland police officer brought CI-2 to the Portland Police Department, where he placed recorded telephone calls to his supplier. *Id.* at 9:06-12. CI-2 used his own cellphone to make the phone call, the same phone law enforcement had taken from CI-2 during his arrest. *Id.* at 9:13-17. The first call took place on December 7, 2018, at about 2:00 p.m. *Id.* at 9:18-20.

3

### 4.      The First Telephone Call

The Government introduced both an audio recording and a transcript of the first telephone call between CI-2 and the person known as Leo.  *Gov't's Exs.* 2, 2A.  A transcript of the call reads:

Mr. Carvajal Gonzalez: Hello.

CI-2: Hello.

Mr. Carvajal Gonzalez: Hey my friend oh my god . . . thank you god, hahah,

CI-2: What's going on?  You around?

Mr. Carvajal Gonzalez: Yeah.

CI-2: Yeah.

Mr. Carvajal Gonzalez: Alright. . . Um.  Today?

CI-2: Yeah.

Mr. Carvajal Gonzalez: Um . . . The same?

CI-2: Yeah.

Mr. Carvajal Gonzalez: Alright.  Okay.  Okay.  Ahh.  I call you when me on my way

CI-2: What time?

Mr. Carvajal Gonzalez: AHHH. . . UI, 3, 3:30.  Alright?

CI-2: You gonna be out here at 3:30?

Mr. Carvajal Gonzalez: Yeah.

CI-2: Okay.

Mr. Carvajal Gonzalez: Okay.  Thanks.  UI.

CI-2: Alright.

*Gov't Ex.* 2A.

In the initial call, Leo confirmed that he would call CI-2 on his way up and would arrive about 3:30 p.m. *Id.* Officer Cyr confirmed that "Leo" was Jose Manuel Carvajal Gonzalez, who is the co-defendant in this indictment.[1] *Tr.* at 10:24-11:02.

After the telephone call, CI-2 told Officer Cyr that he believed Mr. Carvajal Gonzalez also trafficked in cocaine, that Mr. Carvajal Gonzalez owned a gold-colored SUV, and that Mr. Carvajal Gonzalez did not have a driver's license, so he usually found someone to drive for him. *Id.* at 11:06-15. CI-2 said that Mr. Carvajal Gonzalez was expected to bring up ten fingers or 100 grams of fentanyl or heroin. *Id.* at 11:16-18.

### 5.    Text Messages and Times

Following the phone call, CI-2 communicated with Mr. Carvajal Gonzalez by text message because Mr. Carvajal Gonzalez did not speak English very well and it was hard to understand him. *Id.* at 12:01-10. The next communication was a text message introduced as Government's Exhibit 1. *Gov't Ex.* 1. The first message was sent at 2:57 p.m. on December 7, 2018, from CI-2 to Mr. Carvajal Gonzalez. *Id.* The interchange read:

CI-2: How much longer?  I need you to meet me at Burger King on Main st. in Gorham me. – 2:57 p.m.

Mr. Carvajal Gonzalez: Ok. – 3:00 p.m.

CI-2: How much longer? – 3:00 p.m.

---

[1]    As Leo was identified as Mr. Carvajal Gonzalez, the Court's subsequent references, when appropriate, will be to Mr. Carvajal Gonzalez, not "Leo."

Mr. Carvajal Gonzalez: in 10 minutes I go out.  What number – 3:01 p.m.

CI-2: 102 main st.- 3:02 p.m.

Mr. Carvajal Gonzalez: Ok – 3:53 p.m.

CI-2: How long? – 4:15 p.m.

Mr. Carvajal Gonzalez: I am on my way – 4:44 p.m.

CI-2: Did you just leave? – 4:45 p.m.

CI-2: How long?  I need to know when to leave. – 6:33 p.m.

Mr. Carvajal Gonzalez: 15 minute 15 minute – 6:34 p.m.

Mr. Carvajal Gonzalez: how many minutes are you burger king – 6:35 p.m.

Mr. Carvajal Gonzalez: I arrived like in 15 minutes. – 6:36 p.m.

CI-2: Text me when you get there and ill walk, over 1 minute walk. – 6:37 p.m.

Mr. Carvajal Gonzalez: Ok – 6:37 p.m.

CI-2: What car are you in? – 6:39 p.m.

Mr. Carvajal Gonzalez: Crv blue – 6:39 p.m.

CI-2: Meet me by the drive thru back parking lot – 6:44 p.m.

Mr. Carvajal Gonzalez: K perfect – 6:46 p.m.

Mr. Carvajal Gonzalez: 5 minute – 6:51 p.m.

CI-2: K – 6:51 p.m.

Mr. Carvajal Gonzalez: I'm in 5 minutes you're walking – 6:51 p.m.

CI-2: I'll leave in 3 minutes – 6:52 p.m.

Mr. Carvajal Gonzalez: K – 6:53 p.m.

6

Mr. Carvajal Gonzalez: I here I don't see you – 6:58 p.m.

CI-2: Im near the fence in the back – 7:02 p.m.

Mr. Carvajal Gonzalez: It's your car that has the lights on inside – 7:03 p.m.

Mr. Carvajal Gonzalez: You can leave the car to see you. – 7:06 p.m.

Mr. Carvajal Gonzalez: What car – 7:09 p.m.

CI-2: I dont see your car – 7:09 p.m.

CI-2: What kind of a car? – 7:10 p.m.

*Id.*

Officer Cyr was monitoring these texts the whole time. *Tr.* at 13:12-14. Officer Cyr confirmed that the text messages meant that CI-2 and Mr. Carvajal Gonzalez had arranged to meet each other in the Burger King parking lot on Main Street in Gorham, Maine. *Id.* at 14:01-06. As Mr. Carvajal Gonzalez was approaching the Burger King, FBI agents, Gorham police officers, and Maine Drug Enforcement Agency agents were surveilling the arranged meeting. *Id.* at 15:20-24.

### 6.    A Second Telephone Call

In addition to the text messages, there were two more telephone calls between CI-2 and Mr. Carvajal Gonzalez: one at 5:35 p.m. and one other (no time indicated on the exhibit). *Gov't's Exs.* 2, 2B, 2C. The first telephone call, which includes CI-2 speaking with Officer Cyr, reads:

CI-2: Hello

Mr. Carvajal Gonzalez: UI

7

CI-2: How long?

Mr. Carvajal Gonzalez: UI

CI-2: 30 minutes.  Maybe 30 minutes.  Okay.  Alright.  Alright.  Bye.

CI-2: 30 minutes.  He says maybe

Officer Cyr: He'll be here in 30 minutes?

CI-2: Maybe.  He said 30 minutes because he is in traffic.

Officer Cyr: He said he was in traffic?

Officer Cyr: Okay.

Officer Cyr: That was a call received . . . UI.  207-520-3287.  It is approximately 5:35 on December 7, 2018.

*Gov't's Ex.* 2B.

### 7.    A Third Telephone Call

The third telephone call on December 7, 2018, reads:

CI-2: Hello.

Mr. Carvajal Gonzalez: Hello.

CI-2: Where are you?

Mr. Carvajal Gonzalez: UI . . . You car.  You car is the light inside?

CI-2: Yeah.

Mr. Carvajal Gonzalez: Yeah.  UI . . . You go outside please?  Okay.  The car

CI-2: Alright. Yeah.

Mr. Carvajal Gonzalez: Alright.  Alright.  Go outside.

CI-2: Where you at?

8

Mr. Carvajal Gonzalez: UI . . . I'm here.  Go.  Go outside the car.

CI-2: UI . . . Yeah.  What are you driving?

Mr. Carvajal Gonzalez: Uh . . . UI . . .

CI-2: You in a van?

Mr. Carvajal Gonzalez: You.  You.  Go outside.  Go outside the car.

(phone hangs up)

*Gov't's Ex.* 2C.  Officer Cyr confirmed that the second telephone call took place about 5:35 p.m.  *Tr.* at 17:08-09.  He confirmed that because CI-2 answered the call quickly, the task force members had not told CI-2 to put the phone on speakerphone and therefore, they could hear only CI-2, not Mr. Carvajal Gonzalez.  *Id.* at 17:10-16.  CI-2 relayed what Mr. Carvajal Gonzalez said to the task force members.  *Id.* at 17:17-21.  Officer Cyr relayed the information by cellphone to Agent Clancy, who was present at the Burger King.  *Id.* at 17:22-18:05.

### 8.    The Identification and Arrest

Officer Cyr testified that law enforcement did not intend to have CI-2 walk over to Mr. Carvajal Gonzalez in the Burger King parking lot and identify him.  *Id.* at 18:22-19:3.  In fact, CI-2 was in custody at the Portland Police Department the entire time.  *Id.* at 19:04-09.  Law enforcement had some difficulty making certain which vehicle Mr. Carvajal Gonzalez was in and the text messages were an attempt to identify the vehicle.  *Id.* at 22:06-23:21.  On cross-examination, Officer Cyr agreed that CI-2 had earlier indicated that Mr. Carvajal Gonzalez owned gold SUV.  *Id.* at 27:16-18.  However, when, in the text message, Mr. Carvajal Gonzalez had said he

was in a blue CR-V, Officer Cyr did not ask CI-2 about the apparent difference in the Carvajal Gonzalez vehicles. *Id.* at 27:19-24. Agent Clancy, however, confirmed to Officer Cyr that there was a blue van in the Burger King parking lot with Massachusetts license plates. *Id.* at 28:03-09. Officer Cyr also agreed that when CI-2 was texting for a description of the Carvajal Gonzalez vehicle while Mr. Carvajal Gonzalez was in the Burger King parking lot, Mr. Carvajal Gonzalez did not respond with a description of the vehicle he was in. *Id.* at 30:01-05.

On redirect, Officer Cyr testified that Mr. Almonte Feliz was extracted from a dark blue Honda Odyssey minivan. *Id.* at 30:23-25. Mr. Carvajal Gonzalez had described the car they were in as a blue CR-V, which Officer Cyr said was a Honda. *Id.* at 30:23-31:06. Furthermore, law enforcement had understood that Mr. Carvajal Gonzalez was living in Lawrence, Massachusetts, and therefore law enforcement was looking for a vehicle with Massachusetts license plates. *Id.* at 31:07-18. In addition, CI-2 had described Mr. Carvajal Gonzalez as being male and coming from the Dominican Republic and when Officer Cyr met Mr. Carvajal Gonzalez, he confirmed that Mr. Carvajal Gonzalez is a male from the Dominican-Republic. *Id.* at 31:19-32:03. Finally, when Mr. Carvajal Gonzalez was arrested, law enforcement sent his image to Officer Cyr and CI-2 confirmed that Mr. Carvajal Gonzalez was the man he knew as Leo. *Id.* at 33:05-24. At the same time, Officer Cyr confirmed that CI-2 did not recognize Mr. Almonte Feliz and that Mr. Carvajal Gonzalez had not indicated that he was going to use a driver. *Id.* at 34:14-22.

### B.     Supervisory Special Agent Patrick Clancy

### 1.     Background and Training

Agent Clancy testified that he is a supervisory special agent with the FBI's operational technology division, currently stationed in Quantico, Virginia.  *Id.* at 36:03-06.  In the fall and winter of 2018, Agent Clancy was with the FBI resident agency in Portland, Maine, and was assigned to the Southern Maine Gang Task Force, a task force located at the Portland Police Department.  *Id.* at 36:07-13.  Agent Clancy served as the coordinator of the task force.  *Id.* at 36:13-14.  Agent Clancy briefly expanded upon his training and employment.  *Id.* at 36:15-23.

### 2.     December 7, 2018: The Potential Drug Transaction

On December 7, 2018, Agent Clancy was assigned to supervise the surveillance of what law enforcement understood was going to be a drug transaction at the Burger King on Main Street in Gorham, Maine.  *Id.* at 36:24-37:10.  Law enforcement received information about the drug transaction from a confidential source, namely CI-2.  *Id.* at 37:11-12.  Direct communications with CI-2 went through Officer Cyr. *Id.* at 37:13-17.  The surveillance team held an initial briefing at the Gorham Police Department and Officer Cyr with Task Force Officer Nick Gowen went to Portland to deal directly with CI-2, while the remaining six or seven law enforcement officers remained in Gorham to contact the supposed Massachusetts drug trafficker.  *Id.* at 38:06-17.

The Gorham group started surveillance about 3:30 p.m. and ended it around 7:30 p.m.  *Id.* at 38:18-22.  The surveillance team learned from CI-2 that the

11

Massachusetts dealer was supposed to deliver 100 grams of fentanyl or heroin at the Burger King. *Id.* at 39:02-06. Officer Cyr informed Agent Clancy that the trafficker was in a blue Honda CR-V and the surveillance team periodically received updates as to where the trafficker was. *Id.* 39:06-09. The timetable kept shifting to later in the day. *Id.* at 39:08-10. Agent Clancy was informed that the trafficker was a Hispanic male coming from the Lawrence, Massachusetts, area. *Id.* at 39:11-14. From the start of surveillance until the end, the surveillance team did not see any cars with Massachusetts license plates, except for Mr. Carvajal Gonzalez's vehicle. *Id.* at 39:15-40:01.

When the blue Honda minivan with Massachusetts license plates arrived at the Burger King, the surveillance team ran the plates and the registered owner was Stevenson Almonte from Lawrence, Massachusetts. *Id.* at 39:23-40:07. The blue minivan went to the parking lot to the east of the Burger King and parked. *Id.* at 40:08-12. Officer Cyr confirmed that CI-2 was in touch with Mr. Carvajal Gonzalez and that the drug trafficker from Massachusetts was supposed to have arrived at the Burger King parking lot. *Id.* at 40:13-18. During this time, the surveillance team and Officer Cyr were in constant communication by cellphone to maintain the appearance that CI-2 was going to appear at the Burger King parking lot to complete the transaction. *Id.* at 40:23-41:18.

The blue minivan arrived at the parking lot shortly after 7:00 p.m. *Id.* at 41:19-21. After the minivan parked, the driver exited the vehicle and entered the Burger King. *Id.* at 41:22-42:01. The team observed that there had been at least two persons

12

in the blue minivan.  *Id.* at 42:02-03.  The driver came out of the Burger King, returned to the vehicle, and then moved the blue minivan to a different area of the same parking lot.  *Id.* at 42:03-07.  The driver was inside the Burger King for about eight minutes.  *Id.* at 42:08-10.

After the blue minivan parked again, the surveillance team noticed that the minivan began to move again, and Agent Clancy ordered the team to make the traffic stop.  *Id.* at 42:11-18.  Agent Clancy explained that law enforcement thought there were drugs inside the blue minivan, and he was concerned that they were going to leave the parking lot.  *Id.* at 42:19-25.  Agent Clancy did not want to make the traffic stop on the street.  *Id.*

Agent Clancy testified that he believed that at that point, they had probable cause to make the stop.  *Id.* at 43:01-03.  He explained the basis for his probable cause determination:

> Information from TFO Cyr from [CI-2] that the individual who was delivering the drugs was there.  The tags on the vehicle coming back to a Hispanic male in Lawrence - - based in Lawrence, Massachusetts. The fact that it was a Honda.  And when we were relaying that it was a minivan, I believe TFO Cyr had told [CI-2] that we see a blue minivan and [CI-2] recalled at that point that the blue minivan had previously - - or dark-colored minivan had previously delivered drugs to [CI-2].  Based on the totality of that is what alerted or caused me to - - to - - to start the traffic stop.

*Id.* 43:07-17.

At this point, the Government introduced as Government's Exhibit 3 and played a DVD of the traffic stop taken from the dashboard of one of the Gorham police officer's cruisers.  *Gov't Ex.* 3; *Tr.* at 43:18-44:20.  The DVD showed the team

members detaining the two occupants of the blue minivan and placing them in handcuffs to avoid their making poor decisions, such as attempting to flee. *Tr.* at 46:04-15. Agent Clancy made the decision to search the minivan. *Id.* at 46:16-18. He explained the basis for his decision:

> Based on what we had known historically about the vehicle being involved in previous drug transactions with [CI-2], [CI-2] was in contact with an individual that we believed was in that van that was supposed to be transporting a quantity of drugs to Maine for further distribution, and while we were approaching the vehicle and other law enforcement officers were in the process of detaining the individual, the driver and the passenger, you could see inside the vehicle that there was a center panel of the dashboard that had been disturbed and was not sitting properly, certainly not installed by the factory, and you could see some green plastic wrapping that was easily viewable from standing outside the vehicle. And I was told by another officer that we believe that the - - the drugs are hidden behind that temperature control panel.

*Id.* at 46:19-47:10. Agent Clancy stated that law enforcement frisked both individuals and found no contraband. *Id.* at 47:11-18. Consequently, Agent Clancy believed that the drugs must have been located in the vehicle. *Id.* at 47:19-23. Agent Clancy stated that in his experience, drug traffickers often hide drugs within vehicles in areas known by law enforcement as "[h]ides." *Id.* at 47:24-48:05.

Agent Clancy acknowledged that law enforcement did not obtain a search warrant before searching the blue minivan. *Id.* at 48:24-25. He stated that he is "familiar with the vehicle exception to the requirement to obtain a warrant." *Id.* at 49:03-04. He noted that the arrests had been made at night, and the surveillance team had already made "quite a large footprint" in the Burger King parking lot and had "disturbed some of Burger King's business . . .." *Id.* at 49:04-11.

14

Through Agent Clancy, the Government introduced as Government's Exhibit 4 a photograph of the inside of the blue minivan before the search of the vehicle. *Gov't's Ex.* 4; *Tr.* at 50:09-12.  It showed the center console of the vehicle depicting the temperature control panel offset and not placed where it would normally be as factory-installed with a noticeable gap.  *Gov't's Ex.* 4; *Tr.* at 50:13-20.  Also, on the driver's side, a green plastic wrapping was visible between the shifter panel and the temperature control panel.  *Gov't's Ex.* 4; *Tr.* at 50:21-51:04.

Agent Clancy was also asked about Government's Exhibit 5, a photograph of the back side of the temperature control panel, which law enforcement lifted off to reveal the hide behind the panel; the hide held a green bundle, which contained 100 grams of fentanyl/heroin, and a sock they later determined contained additional drugs.  *Gov't's Ex.* 5; *Tr.* at 51:05-16.  To remove the temperature control panel, law enforcement did not need any tools; the panel came off just by lifting.  *Tr.* at 51:17-23.

Government's Exhibit 6 is a photograph that shows a piece of blue and grey fabric, which Agent Clancy identified as the sock within the hide.  *Gov't's Ex.* 6; *Tr.* at 51:24-53:02.  In the photograph directly underneath the sock are three plastic bundles containing an "off-white, powdery, chunky substance," and to the right is the green plastic that contained the two loose fingers of fentanyl/heroin.  *Gov't's Ex.* 6; *Tr.* at 51:24-52:08.  Each "finger" is supposed to contain ten grams.  *Tr.* at 52:09-13. Agent Clancy testified that they retrieved ten fingers of fentanyl/heroin from the green cellophane.  *Id.* at 53:13-15. Based on the earlier discussions between CI-2 and

Mr. Carvajal Gonzalez, law enforcement expected to find ten fingers or 100 grams of fentanyl/heroin inside the vehicle.  *Id.* at 53:16-54:07.  That was the amount recovered from the green cellophane.  *Id.* at 54:09-10.  Law enforcement was not expecting to find the additional drugs that were located in the hide behind the temperature control panel.  *Id.* at 54:11-16.

Government's Exhibit 7 is a photograph of the Certificate of Registration for the blue  Honda minivan that had been the subject of the stop and search.  *Gov't Ex. 7*; *Tr.* at 52:17-24.  The Certificate of Registration confirmed that the vehicle was registered to Stevenson Almonte from Lawrence, Massachusetts.  *Gov't Ex. 7*; *Tr.* at 52:25-53:01.

Government's Exhibit 8 is an "exit photo," meaning a photograph of the vehicle taken after the search with the driver's door open and showing the driver's seat and a portion of the passenger compartment.  *Gov't Ex.* 8; *Tr.* at 53:02-07, 59:06-60:18.

On cross-examination, Agent Clancy testified that the drive-up window to the Burger King was located on the west side of the building or the side away from where they stopped the blue minivan, but he also indicated that to get to the drive-up, a customer would have to pass the area where the stop and search was made.  *Id.* at 55:08-24.

Agent Clancy agreed that law enforcement first identified the blue minivan as a "dark-colored minivan.".  *Id.* at 56:07-16.  He also agreed that law enforcement did not know the true identify of "Leo" until after they made his arrest.  *Id.* at 56:17-19. What law enforcement knew when they ran the license plate is that the vehicle was

a blue Honda Odyssey and was owned by Stevenson Almonte Feliz. *Id.* at 56:15-24. Although photographs were later sent to CI-2, law enforcement did not send photographs to him and therefore they did not know whether Mr. Almonte Feliz's minivan was the same minivan that CI-2 had seen earlier associated with Mr. Carvajal Gonzalez. *Id.* at 57:12-58:05. But CI-2 had indicated to Officer Cyr that Mr. Carvajal Gonzalez had previously arrived in a blue minivan. *Id.*

Agent Clancy agreed that both Mr. Carvajal Gonzalez and Mr. Almonte Feliz were cooperative, although he noted that Mr. Carvajal Gonzalez may have had difficulty understanding English. *Id.* at 58:09-25. Agent Clancy agreed that neither Mr. Carvajal Gonzalez nor Mr. Almonte Feliz mentioned a hidden compartment, and CI-2 also did not mention one. *Id.* at 61:15-23. Finally, Agent Clancy confirmed that although there was a dog at the scene, the dog did not sniff either occupant of the vehicle before the search of the vehicle. *Id.* at 62:07-12.

## III.    THE POSITIONS OF THE PARTIES

### A.    Stevenson Almonte Feliz's Motion

On November 12, 2019, Mr. Almonte Feliz filed a motion to suppress because he alleged that law enforcement illegally arrested him and illegally searched his vehicle without a warrant. *Def.'s Mot.* at 1-3. Mr. Almonte Feliz charges that the law enforcement officers did not have probable cause to make the arrest or perform the search. *Id.* at 2-3. He demands that the results of the search be suppressed. *Id.* at 3.

### B.      The Government's Opposition

On December 23, 2019, the Government responded. *Gov't's Opp'n* at 1. After reviewing the events leading up to the search, the Government cites caselaw to set forth the standard for probable cause to detain Mr. Almonte Feliz. *Id.* at 3-5. The Government discusses *United States v. Merritt*, 945 F.3d 578 (1st Cir. 2019), as presenting a weaker factual case for probable cause but surviving an appellate challenge. *Id.* at 4-5 (citing *Merritt*, 945 F.3d at 584-85). The Government also cites this case for the proposition that "probable cause to arrest multiple individuals arises even when information from an informant only implicates the potential wrongdoing of one." *Id.* at 4. The Government marshals the facts in this case and argues that the law enforcement officers had probable cause because the anticipated facts matched the event as it transpired. *Id.* at 5.

The Government turns to the automobile exception to the warrant requirement. *Id.* at 6-8. After reviewing the events leading up to the search and seizure, the Government discusses the First Circuit case of *United States v. Polanco*, 634 F.3d 39 (1st Cir. 2011), and urges the Court to conclude that the search and seizure of the vehicle was permissible. *Id.* at 7-8.

### C.      Stevenson Almonte Feliz's Supplemental Memorandum

On April 9, 2020, Mr. Almonte Feliz filed his supplemental memorandum following the suppression hearing of February 28, 2020. *Def.'s Suppl. Mem.* at 1-10. Mr. Almonte Feliz reviews the evidence at the suppression hearing. *Id.* at 1-3. He first argues that both he and his vehicle were unlawfully seized. *Id.* at 3-8. Next, he

argues that the search of his vehicle was unlawful. *Id.* at 8-9. Finally, he contends that the evidence that was seized must be suppressed as the fruit of the poisonous tree. *Id.* at 9-10.

Turning to the arrest of the individuals and the vehicle, Mr. Almonte Feliz notes that where a confidential informant is involved, "law enforcement must provide some information from which a court can credit the informant's credibility." *Id.* at 4 (quoting *United States v. Gonsalves*, 859 F.3d 95, 103 (1st Cir. 2017)). Here, Mr. Almonte Feliz asserts that, although CI-2 claimed first-hand knowledge, his "reliability was never tested prior to this controlled buy." *Id.* at 5. Mr. Almonte Feliz says CI-2 did not know "'Leo's' true name nor his address . . . ." *Id.* He adds that although CI-2 provided a general description of Mr. Carvajal Gonzalez's vehicle, he did not identify the vehicle in which Mr. Carvajal Gonzalez actually arrived. *Id.* Mr. Almonte Feliz states that CI-2 provided no information about the sale, and whether it was to take place in the vehicle or outside, or about the driver. *Id.* He points out that CI-2 also gave no information about where the drugs were likely to be found: on Mr. Carvajal Gonzalez's person or in the vehicle. *Id.* According to Mr. Almonte Feliz, during the telephone and text communication between Mr. Carvajal Gonzalez and CI-2, there was no mention of drugs or terminology associated with drugs. *Id.* Mr. Almonte Feliz disputes the relevance of and the Government's analysis of *Merritt*. *Id.* at 6-7. He views *Merritt* as dealing with more detailed and reliable facts before the arrest. *Id.*

19

Incorporating his arguments against the seizure of both himself and his vehicle, Mr. Almonte Feliz says that the probable cause analysis was unchanged after law enforcement detained Mr. Carvajal Gonzalez and identified him as "Leo." *Id.* at 8-9.  Nor did Mr. Almonte Feliz, according to him, provide any information that justified the seizure and search of the vehicle.  *Id.* at 9.

Finally, Mr. Almonte Feliz is skeptical that Agent Clancy could view the "green plastic wrapping" from outside the vehicle.  *Id.* at 9.  He claims that this statement is a "clear attempt to provide an alternative basis—the plain view doctrine—upon which the Court might find the search to have been lawful."  *Id.*  He urges the Court to "carefully scrutinize" this claim and the "true probability of this wrapping having been plainly visible from outside the vehicle on the driver's side, as Detective Clancy has claimed."  *Id.*  He contends that an outside view would be "obscured by the steering wheel and the gear shift."  *Id.*  He reminds the Court that the search took place at 7:00 p.m. on December 7, 2018, and therefore it would have been dark outside.  *Id.*  Lastly, he claims that none of the other exceptions to the warrant requirement saves the warrantless search here.  *Id.* at 10.

### D.    The Government's Supplemental Opposition

On May 18, 2020, the Government responded to Mr. Almonte Feliz's supplemental memorandum.  *Govt's Suppl. Mem* at 1-8.  After reviewing the evidence at the suppression hearing, the Government listed factors that in its view substantiate the existence of probable cause for the seizure of Mr. Almonte Feliz and his van and the search of the van.  *Id.* at 6-7.

## IV.   LEGAL STANDARDS

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV; *see United States v. Ramírez-Rivera*, 800 F.3d 1, 27 (1st Cir. 2015), *overruled on different grounds recognized by United States v. Leoner-Aguirre*, 939 F.3d 310, 314-18 (1st Cir. 2019). Regarding the warrantless arrest, the United States Supreme Court held in *Carroll v. United States*, 267 U.S. 132 (1925), and affirmed in *United States v. Watson*, 423 U.S. 411 (1976), that a law enforcement officer with probable cause may make a warrantless arrest for a felony in a public place, even though the officer may have had an adequate opportunity to obtain an arrest warrant. *Carroll*, 267 U.S. at 156; *Watson*, 423 U.S. at 417; *see also United States v. Parker*, 549 F.3d 5, 8 (1st Cir. 2008) ("Outside the home, the police can arrest without a warrant anyone who they have probable cause to believe committed a felony").

Similarly, with a warrantless search of a vehicle, in *Carroll*, the Supreme Court held that law enforcement may search a vehicle without a warrant so long as the officer has probable cause to believe that the vehicle contains contraband. *Carroll*, 267 U.S. at 158-59; *see also Gonsalves*, 859 F.3d at 103; *United States v. Goncalves*, 642 F.3d 245, 249 (1st Cir. 2011) ("[C]urrent law is that 'a search [of a vehicle] is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not actually been obtained.' The question is whether probable cause exits to believe that a vehicle contains contraband or

evidence of criminal activity" (alteration in original) (internal citation omitted) (quoting *United States v. Ross*, 456 U.S. 798, 809 (1982))).  The issue here, therefore, is whether the law enforcement officers had probable cause to effect the arrest and to search the vehicle.

In *Kaley v. United States*, 571 U.S. 320 (2014), the United States Supreme Court wrote that "[p]robable cause . . . is not a high bar . . .." *Id.* at 338.  Probable cause "requires only the kind of fair probability on which reasonable and prudent [people,] not legal technicians, act." *United States v. Rasberry*, 882 F.3d 241, 249-50 (1st Cir. 2018) (alteration in original) (quoting *Kaley*, 571 U.S. at 338).  Quoting the United States Supreme Court, the First Circuit defined "probable cause" as a "fluid concept," one that is "not readily, or even usefully, reduced to a neat set of legal rules." *Rasberry*, 882 F.3d at 249-50 (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)).  The First Circuit observed, however, that an "objective standard is employed to determine whether an officer has probable cause to effect an arrest." *Id.* at 250.  The First Circuit directed an "inquiring court" to "examine the events leading up to the arrest and then determine 'whether these historical facts, viewed from the standpoint of a reasonable police officer, amount to probable cause.'" *Id.* (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).  Similarly, where a vehicle search is involved, "[p]robable cause only exists when the totality of the circumstances suggests that there is a fair probability that contraband or evidence of a crime will be found in [the vehicle]." *Gonsalves*, 859 F.3d at 103 (internal quotation marks omitted) (quoting *Ramírez-Rivera*, 800 F.3d at 27).

The First Circuit carved out special rules for assessing statements of cooperating informants in determining whether law enforcement had probable cause to arrest or search. "Where . . . the police act on information from a confidential informant, 'law enforcement must provide some information from which a court can credit the informant's credibility.'" *Gonsalves*, 859 F.3d at 103-04 (quoting *United States v. White*, 804 F.3d 132, 136 (1st Cir. 2015) (quoting *Ramírez-Rivera*, 800 F.3d at 27-28)). The First Circuit developed a "non-exhaustive" list of factors to examine in deciding on an informant's reliability:

> (1) the probable veracity and basis of knowledge of the informant;
> (2) whether an informant's statements reflect first-hand knowledge;
> (3) whether some or all the informant's factual statements were corroborated wherever reasonable and practicable; and
> (4) whether a law enforcement officer assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's information.

*White*, 804 F.3d at 137 (citing *Ramírez-Rivera*, 800 F.3d at 27-28).

In *Gonsalves*, the First Circuit reviewed whether the confidential informant had "a track record of supplying reliable information to police," whether the informant had "first-hand knowledge" of the targeted operation, whether the tip included "detail of [the suspects'] future activities 'ordinarily not easily predicted,'" whether the police corroborated those details before stopping the individuals or vehicle, and whether the police "assessed and understood the significance" of the cooperating informant's information before making the stop. 859 F.3d at 104 (quoting *Ramírez-Rivera*, 800 F.3d at 29). This last factor involves whether law enforcement had "independent knowledge" of the suspects' activities through its investigation. *Id.*

Finally, the First Circuit discussed any indicia of the informant's "unreliability . . .." *Id.* at 105.  In making this assessment, the First Circuit stressed that the probable cause assessment must be "under the totality of the circumstances . . .." *Id* (citing *White*, 804 F.3d at 136).

## V.   FINDINGS OF FACT

Based on the evidence admitted at the February 28, 2020, suppression hearing, the Court makes several factual findings:

(1)    In late 2018, there was a drug distributor in Gorham, Maine, who was dealing fentanyl and heroin in the Gorham, Maine, area;

(2)    the drug distributor, known here as CI-2, had a source of supply located in the Lawrence, Massachusetts, area;

(3)    the drug supplier was a Hispanic male originally from the Dominican Republic;

(4)    CI-2 knew his supplier only by the name "Leo;"

(5)    Leo is Jose Manuel Carvajal Gonzalez;

(6)    CI-2 and Mr. Carvajal Gonzalez had previously engaged in drug transactions whereby Mr. Carvajal Gonzalez would supply CI-2 with fentanyl and heroin;

(7)    in addition to fentanyl and heroin, Mr. Carvajal Gonzalez would also supply cocaine;

(8)      the prior transactions began with contact between CI-2 and Mr. Carvajal Gonzalez in which CI-2 would order drugs and Mr. Carvajal Gonzalez would transport the drugs to Maine;

(9)      after contact, Mr. Carvajal Gonzalez would arrive in Maine at an agreed-upon time and place, meet CI-2, and exchange the drugs;

(10)    Mr. Carvajal Gonzalez would not drive himself, but would have a driver transport him and the drugs to Maine;

(11)    CI-2 recalled that Mr. Carvajal Gonzalez would arrive in a gold SUV;

(12)    in the fall of 2018, the FBI with local law enforcement established a task force dedicated to the investigation of illegal drug trafficking in southern Maine;

(13)    at some point, the task force was able to have an individual, known as CI-1, do a controlled buy of fentanyl from CI-2;

(14)    the task force arrested CI-2;

(15)    CI-2 agreed to cooperate with law enforcement by setting up a controlled purchase of drugs from Mr. Carvajal Gonzalez, his Massachusetts supplier;

(16)    on December 7, 2018, at 2:00 p.m., CI-2 placed a recorded call to Mr. Carvajal Gonzalez;

(17)    CI-2 and Mr. Carvajal Gonzalez knew each other before the telephone call ("Hey my friend oh my god");

(18)    Mr. Carvajal Gonzalez agreed to make a drug delivery to CI-2 that day in Maine;

25

(19)    the drug quantity was going to be the same amount as Mr. Carvajal Gonzalez had previously supplied CI-2 ("The same?");

(20)    CI-2 told law enforcement that a regular shipment from Mr. Carvajal Gonzalez would equal ten "fingers" or 100 grams;

(21)    Mr. Carvajal Gonzalez estimated his time of arrival in Maine at 3:00 to 3:30 p.m. that afternoon;

(22)    Mr. Carvajal Gonzalez agreed to call CI-2 when he was on his way;

(23)    subsequently, Mr. Carvajal Gonzalez and CI-2 began to communicate by text messages;

(24)    at 2:57 p.m., CI-2 texted Mr. Carvajal Gonzalez with a place (Burger King on Main Street in Gorham, Maine) and asked about a time for the meeting;

(25)    at approximately 5:35 p.m., CI-2 called Mr. Carvajal Gonzalez;

(26)    during the telephone call, Mr. Carvajal Gonzalez told CI-2 that he was in traffic but would be there in thirty minutes;

(27)    CI-2 texted Mr. Carvajal Gonzalez to find out when he was going to arrive at the Burger King;

(28)    at 6:36 p.m., Mr. Carvajal Gonzalez texted CI-2 that he expected to arrive at the Burger King in fifteen minutes;

(29)    at 6:39 p.m., as Mr. Carvajal Gonzalez neared the Burger King, he texted CI-2 that he was in a "Crv blue;"

(30)    a CR-V is a Honda minivan;

26

(31)    at 6:44 p.m., CI-2 told Mr. Carvajal Gonzalez to meet him near the drive-thru by the back of the parking lot;

(32)    law enforcement observed a dark-colored Honda minivan with Massachusetts license plates enter the Burger King parking lot;

(33)    law enforcement ran the license plates and determined that the Honda CR-V was registered to Stevenson Almonte of Lawrence, Massachusetts, and was blue;

(34)    there were no other vehicles in the Burger King parking lot that had Massachusetts license plates;

(35)    the driver exited the Honda minivan and went into the Burger King;

(36)    the driver was a male who appeared to be Hispanic;

(37)    when the driver returned to the parked Honda minivan and reentered the Honda, the car began to move;

(38)    law enforcement detained both occupants, later identified as Mr. Carvajal Gonzalez and Stevenson Almonte Feliz;

(39)    both Mr. Carvajal Gonzalez and Mr. Almonte Feliz are from the Dominican Republic;

(40)    although there was some language barrier, Mr. Carvajal Gonzalez and Mr. Almonte Feliz were cooperative and did not attempt to flee or resist detention;

(41)   when law enforcement frisked Mr. Carvajal Gonzalez and Mr. Almonte Feliz, they did not find either of them had any illegal drugs on their persons, although law enforcement did not search either of them beyond the frisk;

(42)   when illegal drugs are transported, it is common for the drugs to be placed in a hide, a hiding place within the vehicle;

(43)   when the officers looked into the vehicle from the driver's side window, they observed that the center panel of the Honda had been disturbed in a fashion consistent with it having been removed and replaced after manufacture;

(44)   they also observed green cellophane protruding from a crack between the shifter panel and the temperature control panel of the Honda;

(45)   the disruption of the center panel and the green cellophane were consistent with illegal drugs having been placed in a hide within the Honda;

(46)   the detention of Mr. Carvajal Gonzalez and Mr. Almonte Feliz had taken place in the dark in a busy parking lot;

(47)   one car was so close to the Honda  that law enforcement temporarily detained the occupants to make certain they were not involved in the transaction;

(48)   although there was a drug detection dog present at the scene, the dog did not sniff Mr. Carvajal Gonzalez or Mr. Almonte Feliz or detect the presence of illegal drugs before law enforcement entered the vehicle and searched it;

(49)   law enforcement did not obtain or attempt to obtain either a search warrant or an arrest warrant before searching the Honda and arresting Mr. Carvajal Gonzalez and Mr. Almonte Feliz; and

(50)   when law enforcement entered the Honda and removed the control panel, they found a package of green cellophane that contained ten fingers or 100 grams of fentanyl/heroin and a sock that contained three bundles of an off-white chunky substance.

## VI.   DISCUSSION

### A.   The Probable Cause Standard Applied to the Evidence

Applying the probable cause standard to the events in this case, the Court concludes that law enforcement had probable cause to search Mr. Almonte Feliz's vehicle and to effect his arrest.  The events as they transpired closely matched the events CI-2 predicted: (1) CI-2 had come to the attention of law enforcement through making a controlled sale of illegal drugs to CI-1, which confirms CI-2's familiarity with drug trafficking; (2) CI-2 agreed to cooperate against what he said was the source of the fentanyl/heroin that he was selling; (3) CI-2's familiarity with Mr. Carvajal Gonzalez is evidenced in the first telephone call; (3) CI-2 said that his source was a male from the Dominican Republic who was living in the Lawrence, Massachusetts, area; (3) the previously-established modus operandi whereby Mr. Carvajal Gonzalez would come from Massachusetts to Maine in a vehicle driven by someone else and meet CI-2 in Maine to effect the transaction was consistent with the events of December 7, 2018; (4) the prior pattern of drug trafficking conduct is

evidenced by the fact that neither CI-2 nor Mr. Carvajal Gonzalez needed to be explicit about the type of drug, the drug quantity, or the price; (5) Mr. Carvajal Gonzalez's description of the car in which he was transporting the drugs matched the description of the blue Honda minivan that entered the Gorham Burger King parking lot; (6) the Honda minivan was the only car with Massachusetts license plates in the Burger King parking lot at the time of the surveillance, detention, search, and arrest; (7) the results from running the plates confirmed that the owner of the Honda minivan was a person with a Hispanic surname from Lawrence, Massachusetts and that the minivan was blue; (8) the blue Honda minivan arrived at the Gorham Burger King parking lot near the appointed time; and (9) the location of the Honda minivan within the Burger King parking lot was consistent with the agreed-upon location. Based on all this consistent, detailed information, the Court concludes that law enforcement had the right to detain both Mr. Carvajal Gonzalez and Mr. Almonte Feliz.

After detaining Mr. Carvajal Gonzalez and Mr. Almonte Feliz, law enforcement gathered two other pieces of information. First, law enforcement confirmed by frisking Mr. Carvajal Gonzalez and Mr. Almonte Feliz that neither had drugs on their person (at least drugs that would have been revealed by a frisk), which made it more likely that the drugs were in the vehicle. Second, when the officers looked into the vehicle they observed the displaced temperature control panel and the presence of green cellophane peaking from a crack in the panel. Taking all this information, which the Court credits, the Court concludes that law enforcement had

sufficient probable cause to believe that the Honda minivan contained illegal drugs in a hide within its control panel.  The Court concludes that probable cause existed immediately before the vehicle search because "the totality of the circumstances suggests that there is a fair probability that contraband or evidence of a crime will be found in [the vehicle]."  *Gonsalves*, 859 F.3d at 103 (quoting *Ramírez-Rivera*, 800 F.3d at 27).  Assessing the facts in *Merritt* where the First Circuit concluded there was probable cause, *see Merritt*, 945 F.3d at 584-85, the Court concludes that the evidence in this case fits snugly within the array of facts that the First Circuit has previously ruled sufficient for probable cause.

In his memoranda, Mr. Almonte Feliz emphasizes that CI-2 told law enforcement that "Leo" usually arrived in a gold minivan, whereas, Mr. Carvajal Gonzalez arrived this time in a blue Honda minivan.  Although the Court acknowledges this discrepancy, it does not find the difference sufficient to undercut its conclusion that the officers had probable cause to search the vehicle.  First, the Court is not convinced that there is a significant factual difference between a Honda CR-V and a minivan.[2]  Next, CI-2 also told law enforcement that "Leo" did not drive himself but used a driver.  It is true that the predicted color of gold did not turn out to be the color of the Honda minivan that arrived.  However, if Mr. Carvajal Gonzalez used a driver, the color of the van might depend on the identity of the driver and, in any event, even if the minivan was usually gold, it does not mean that Mr. Carvajal

---

[2]     The Honda CR-V and Honda Odyssey are different car models.  There is no evidence in this record that the differences in body size and overall look between a crossover SUV and a minivan matter.

Gonzalez did not have access to more than one vehicle or that the owner of the gold vehicle could not have a second car or traded a gold for a blue vehicle. This discrepancy is not enough to dispel the otherwise strong case for probable cause.

Finally, the Court does not join Mr. Almonte Feliz's stated skepticism of the truthfulness of Agent Clancy's testimony that an examination of the control panel from outside the car revealed that there was a gap between the control panel and the shift panel and that a portion of green cellophane was visible in the gap. Government Exhibit 4 clearly corroborates Agent Clancy's testimony and, contrary to Mr. Almonte Feliz's doubts, the Court found Agent Clancy to be a credible, straightforward witness whose testimony was fully corroborated by other demonstrable facts.

### B.     The Credibility of the Confidential Informant

The Court turns to Mr. Almonte Feliz's second issue: the credibility of CI-2. Taking the First Circuit's non-exhaustive list of considerations set forth in *White*, 804 F.3d at 137, the Court concludes that CI-2 did have personal, first-hand knowledge of Mr. Carvajal Gonzalez's drug-trafficking operation; that although there is no evidence that CR-2's detailed statements were corroborated by third persons, Mr. Carvajal Gonzalez's own statements on the telephone and by text corroborated CI-2's statements to law enforcement; and that the members of the task force determined that CI-2's statements were sufficiently credible to organize a fairly elaborate operation to investigate and act on the information.

Finally, the Court focuses on the "probable veracity" factor. *Id.* ("the probable veracity and basis of knowledge of the informant"). The strongest indication of a

confidential informant's veracity occurs when the informant's detailed predictions of the future turn out to occur as predicted. Here, CI-2 predicted or provided information that a drug trafficker from the Lawrence, Massachusetts, area would arrive in the Burger King parking lot on Main Street in Gorham, Maine, at around 7:00 p.m. on December 7, 2018, in a car with Massachusetts license plates occupied by two Hispanic males, one being the driver and the other the drug supplier, would park in the rear of the Burger King parking lot, and would bring 100 grams of fentanyl/heroin with him. All this information turned out to be exactly correct in each of its details and, therefore, "law enforcement [has] provide[d] some information from which a court can credit the informant's credibility." *Gonsalves*, 859 F.3d at 103-04 (quoting *White*, 804 F.3d at 136). The Court therefore credits the credibility of CI-2 over Mr. Almonte Feliz's objections.

## VII.   CONCLUSION

The Court DENIES Defendant's Motion to Suppress Tangible Evidence (ECF No. 93).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 17th day of June, 2020

33